UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

R.E. and M.E., individually and on
behalf of J.E.,

                   Plaintiffs,             10 Civ. 3176

   -against-                        OPINION

NEW YORK CITY DEPARTMENT OF EDUCATION,

                   Defendant.

----------------------------------------X

A P P E A R A N C E S:

       Attorneys for Plaintiffs

       MAYERSON & ASSOCIATES
       330 West 38th Street, Suite 600
       New York, NY  10018
       By:  Gary S. Mayerson, Esq.


       Attorneys for Defendants

       MICHAEL A. CARDOZO
       Corporation Counsel of the City of New York
       100 Church Street, Room 2-306
       New York, NY  10007
       By:  Lesley Berson, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-15-11

**Sweet, D.J.**

The plaintiffs R.E. and M.E., on their own behalf and
that of their son J.E. ("Plaintiff" or the "Student")
(collectively, the "Plaintiffs"), have moved pursuant to Rule
56, Fed. R. Civ. P., for summary judgment granting reimbursement
for J.E.'s educational program costs and reversing the decision
of the State Review Officer ("SRO").  The defendant Department
of Education of the City of New York ("DOE" or the "Defendant")
has cross-moved under the same rule for summary judgment
dismissing Plaintiffs' complaint.

At issue is the adequacy of an Individualized
Education Program ("IEP") offered by the DOE to J.E. and his
family, to provide a Free Appropriate Public Education ("FAPE")
for J.E. under the Individuals with Disabilities Education
Improvement Act ("IDEIA").  The IEP was determined to be
inadequate by an Impartial Hearing Officer ("IHO"), a decision
that was appealed by the DOE and subsequently annulled by the
SRO.  These issues are difficult, highly individualized and
procedurally complicated, as indicated by the challenging
concepts and assorted acronyms.  Their correct resolution

1

appears critical to J.E. and his parents.  Based on the facts and conclusions set forth below, the motion of the Plaintiffs is granted, and the cross-motion of the DOE is denied.

## Prior Proceedings

Plaintiffs filed their complaint on April 14, 2010 seeking reimbursement for the expense of J.E.'s placement in the McCarton School for the 2008-2009 school year and the reversal of the decision of the SRO.

Plaintiffs' motion for summary judgment granting the relief sought in the complaint and the DOE cross-motion for summary judgment dismissing the complaint were heard on October 27, 2010.

## The Facts

The facts have been set forth in Plaintiffs' Local Rule 56.1 Statement of Material Facts, Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts, and Defendant's Response to Plaintiffs' Statement of Material Facts, and are not disputed except as noted below.

Plaintiff J.E. was born on August 31, 1999 and Plaintiffs R.E. and M.E. are his father and mother.

At all relevant times, J.E. has been and continues to be a "child with a disability" as that term is defined under the IDEIA, 20 U.S.C. § 1400 et seq., and is classified as a student with autism, as that term is defined by 20 U.S.C. § 1401(a)(1).

DOE is the local educational agency in the City of New York ("City") and is responsible for making a FAPE available to any child with disabilities between the ages of 3 and 21 who resides in the City, including J.E.

J.E. has attended the McCarton School since the 2001-2002 school year.

On May 21, 2008, the Committee on Special Education ("CSE") convened to formulate an IEP for J.E. and to make recommendations for the 2008-2009 school year. The CSE team comprised the Student's father, a DOE school psychologist, a DOE special education teacher, a parent member, the head teacher from the McCarton School, the Student's speech-language

3

pathologist and occupational therapist from the the McCarton
School, and the director of the McCarton School.  J.E.'s father
attended the CSE team meeting.

        The DOE considered the following documents as part of
J.E.'s May 21, 2008 IEP meeting:  (1) the McCarton School's
Educational Progress Report; (b) the McCarton School's Speech
and Language Progress Report; (c) the McCarton School's
Occupational Therapy Progress Report; and (d) a DOE special
education teacher's observation of J.E. at the McCarton School.
The DOE did not create any evaluations or reports of J.E. on its
own.  No one assessed J.E. to see whether he could learn in a
group setting or with a methodology other than Applied
Behavioral Analyses ("ABA") such as Treatment and Education of
Autism and Related Communication Handicapped Children
("TEACCH").  The last psychological test conducted by the DOE
was in April 2007.

        Plaintiffs submitted all documents requested by DOE
and did not refuse to attend any meeting convened by DOE, nor
did Plaintiffs refuse to agree to any observation or assessment
of J.E. requested by DOE.

The McCarton School personnel cooperated with DOE, reporting that "[w]e [met] with them. . . .  We share[d] our IEP with them.  We share[d] all of our progress reports with them, and the Behavior Intervention Plan."  It is disputed, however, whether the Behavioral Intervention Plan ("BIP") was provided to use for J.E.

J.E.'s McCarton School teachers informed DOE that J.E. exhibits interfering behaviors, including self-stimulatory behaviors such as scripting, escape behaviors, and impulsivity.

The Commissioner's Regulations require that a proper Functional Behavior Assessment ("FBA") include "the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors, and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probably consequences that serve to maintain it."  N.Y. Comp. Codes R. & Regs. ("NYCRR"), tit. 8, § 200.1(r).

The Commissioner's Regulations state that "the FBA shall, as appropriate, be based on multiple sources of

5

data. . . .  The FBA shall not be based solely on the student's
history of presenting problem behaviors."  8 NYCRR
§ 200.22(a)(2).

The Commissioner's Regulations state that "the FBA
shall provide a baseline of the student's problem behaviors with
regard to frequency, duration, intensity and/or latency across
activities, settings, people and times of the day, and include
the information required in section 200.1(r) of this part in
sufficient detail to form the basis for a behavioral
intervention plan for the student that addresses antecedent
behaviors, reinforcing consequences of the behavior,
recommendations for teaching alternative skills or behaviors,
and an assessment of student preferences for reinforcement."  8
NYCRR § 200.22(a)(3).

Xen Xen Guan ("Ms. Guan") developed the FBA upon which
the DOE's BIP was based.  Whether Ms. Guan has training specific
to conducting evaluations for children with autism is contested.
Ms. Guan did not observe, or even request to observe, J.E. to
develop this FBA.  Ms. Guan did not review any data, nor did she
ask for any data from the McCarton School.  The elements of the

FBA were agreed upon at the meeting and the FBA was developed
and written after J.E.'s May 21, 2008 IEP meeting.

A plan was not developed to transition J.E. from his
1:1 placement to the DOE's proposed placement.  Ms. Guan
admitted that transitioning J.E. from the McCarton School to the
proposed program would create significant anxiety for J.E. and
the DOE did not address this concern in IEP or BIP.  According
to the DOE, no federal or state law requires a school district
to include such a plan on a student's IEP when the student is
moving from one elementary school to another.

The McCarton School Education Progress Report, which
was considered by the IEP team, provides an analysis of J.E.'s
then-current educational status and progress.  It states
throughout J.E.'s continued need for 1:1 teaching instruction to
make progress.  "He requires a structured one-to-one environment
to learn, with continuous positive reinforcement, redirection
and adult prompting to remain focused and state on task. . . .
Even with 1:1 support, he often requires repetition of questions
being asked. . . .  Continued treatment using a 1:1 model is
strongly recommended to increase [J.E.'s] abilities and is
necessary to help him develop attentional and behavioral

7

controls." According to the DOE, the Report did not indicate
that the 1:1 support had to be provided by a teacher.

The McCarton School's Speech and Language Progress
Report recommended that J.E. "continue to receive speech and
language therapy five times per week for 60-minute sessions
within the classroom. An additional three afterschool sessions
per week are recommended to facilitate carryover and
generalization of skill[s] acquired in school."

The McCarton School's Occupational Therapy Progress
Report recommended that J.E. continue to receive five 45-minute
sessions per week at a 1:1 ratio.

The DOE Classroom Observation conducted by Ms. Carol
Schaechter gives a description of J.E. working on a 1:1 activity
with a teacher. There is no mention of J.E. working in a group.
Ms. Schaechter also noted that "behaviorally, [J.E.] often seems
sluggish, and tends to slump over in his seat and close his
eyes. He cries and stomps his feet when his regular schedule is
disrupted and becomes anxious over any change of routine or
schedule."

8

Dr. Feldman, the educational director at the McCarton School, testified that it would be "impossible" for J.E. to make meaningful progress in a 6:1:1 classroom setting.  No one at J.E.'s IEP meeting disputed that J.E. required 1:1 instruction.[1]

All of J.E.'s then-current teachers and reports recommended a 1:1 placement for J.E.  The McCarton School reports and teachers indicated that J.E. was educated in a classroom with five other students.  The Educational Progress Report recommended that J.E. continue to receive individualized education with 1:1 "staff support."  The CSE team considered all the McCarton School reports and recommendations, and determined that J.E.'s educational and behavioral needs could be appropriately addressed in a 6:1:1 classroom with a dedicated 1:1 behavior management paraprofessional.

Ms. Guan stated that a 1:1 paraprofessional is not the same as a 1:1 teacher under certain circumstances.  The minimal qualification to be a paraprofessional is a high school diploma.

---

[1]    Defendant's response to this portion of Plaintiffs' statement of material facts appears to be incomplete, so it is not clear if Defendant disputes these facts.

The IEP team recommended a 12-month, 6:1:1 special
class in a special school for the Student (i.e., six students
with disabilities, one teacher, one paraprofessional) in a
school serving only students with disabilities, and considered
other programs with a behavior management professional assigned
throughout the day to provide him with one-on-one support.  The
recommendation for a 6:1:1 ratio came from Ms. Guan and Ms. Jane
O'Connor (the only two DOE members of the IEP team).  None of
the other IEP team members recommended changing J.E. from a 1:1
to a 6:1:1 placement.  The last time that Ms. Guan visited a
6:1:1 placement was two years prior to her testimony, and it was
not the placement proposed for J.E.

The IEP team created an FBA which identified six
behaviors exhibited by J.E. that interfered with his learning:
scripting/self-talk, eye-crossing, vocal protests, impulsivity
and darting behaviors, anxiety and escape behaviors.  The FBA
indicated that these behaviors occurred throughout the school
day, with varying frequency.

FBAs are generally developed by observing a student's
behaviors over a period of time so that the team can identify
the frequency and triggers of the behavior.  However, the IEP

team created the FBA based on the reports of the McCarton School teachers, since J.E. had never attended a DOE school.

In support of the FBA, the CSE team also created a BIP for J.E., which recommended several strategies and supports to address J.E.'s behaviors, including a visual schedule, prompting, redirection, a token reward system, positive reinforcement, and a one-to-one behavior management paraprofessional.  The McCarton School also used a token reward system, positive reinforcement and visual prompts.

The IEP recommended that J.E. receive two 30-minute sessions of group counseling per week to address J.E.'s social skills with his peers, five 30-minute sessions of group OT per week to address his fine motor coordination and fine motor skills, and five 30-minute sessions of individual speech-language therapy per week to address his receptive, expressive and pragmatic delays.

The IEP also set forth fourteen annual goals and 57 short term objectives in the areas of math, reading, written expression, occupational therapy ("OT"), counseling, adaptive

11

physical education, speech and targets for J.E.'s
paraprofessional.

The DOE did not offer Plaintiffs a specific placement
recommendation at J.E.'s IEP meeting.  The DOE stated that the
IEP team "cannot consider a [specific] school [at the IEP
meeting].  What the team does at the IEP meeting is only
consider a program."

Ms. Guan testified that the CSE team recommends
programs and that she felt a non-public school program was not
appropriate for J.E. because "it would be too restrictive to
meet [J.E.'s] needs."  Ms. Guan has only recommended a non-
public school program when the student requires a 24-hour
therapeutic setting.

Ms. Guan, as part of the DOE team to recommend a
program, was not aware of what related services are available at
the proposed placement or whether the proposed placement would
be able to meet J.E.'s related service mandates.

12

Ms. Guan did not recommend any parent training or counseling for Plaintiffs although such training was discussed at the IEP meeting.

According to R.E., DOE personnel at the IEP meeting told Plaintiffs that although the McCarton School is "great," they could not recommend such a placement for J.E., and if Plaintiffs wanted J.E. to be placed there at DOE's expense, they were entitled to an impartial hearing.

Plaintiffs did not receive a copy of the proposed IEP at the conclusion of the IEP meeting. A copy of the IEP was mailed to Plaintiffs on May 22, 2008.

The DOE's Final Notice of Recommendation ("FNR") was mailed on June 9, 2008, recommending a placement at P.S. 208. The FNR included the school's address, and the name and phone number of someone at the school Plaintiffs could contact to arrange a visit. The FNR also provided name and contact information of a placement officer Plaintiffs could contact if they wished to discuss the recommended placement or arrange a second IEP team meeting.

13

Plaintiff R.E. visited the proposed placement at P.S. 208 on June 23, 2008.

The students in the proposed classroom at P.S. 208 range in age from nine through twelve.  J.E. was eight at the beginning of the 2008-2009 school year.

Peter DeNuovo ("DeNuovo"), the special education teacher in the proposed classroom at P.S. 208, testified at the IHO hearing about a variety of methodologies in his classroom including ABA Verbal Variant, TEACCH and DIR to identify, analyze and address the Student's behavioral problems, and how he would monitor J.E.'s behaviors throughout the school year. DeNuovo described how he would track the frequency of the student's behaviors, and implement specific strategies to address them, such as placing J.E.'s desk furthest from the door to discourage his fleeing behaviors.  DeNuovo is not certified in TEACCH or ABA, nor has he ever had any formal teaching using DIR.

The paraprofessionals in DeNuovo's classroom are primarily provided "on the job" training in using the above teaching methodologies through weekly staff meetings.  The only

14

"formal" training the paraprofessionals receive is a "workshop" a few days before school starts for about a "half day."

Plaintiffs provided notice to DOE on June 27, 2008 that its proposed program and placement were inappropriate for J.E., and that J.E. would continue at the McCarton School. Specifically, Plaintiffs indicated the following problems with the proposed placement:  (a) the teaching ratio was 6:1:1 and J.E. requires 1:1 teaching instruction; and (b) the speech services totaled only 3.5 hours per week and J.E. requires eight 45-minute sessions per week to make meaningful progress.  The letter further stated that if the DOE did not offer any other program, Plaintiffs would reject the DOE recommended placement, unilaterally place J.E. at the McCarton School and sue for tuition reimbursement.

The DOE never responded to Plaintiffs' letter rejecting the placement as inappropriate, and it did not recommend any placement other than P.S. 208.

On or about October 10, 2008, more than three months after the beginning of the 2008-2009 school year, Plaintiffs signed the enrollment contract with the McCarton School dated

15

July 14, 2008 for the 2008-09 school year.  The cost of ten

month prorated tuition was $104,167 and $125,000 for 12 months.

By letter dated February 11, 2009, Plaintiffs filed a demand for

due process.

        After holding an impartial hearing over three days

between March 26 and June 16, 2009, IHO William J. Wall issued a

"Findings of Fact and Decision" on August 28, 2009.

        As to Prong I under the Burlington/Carter test,[2] the

IHO held that the IEP developed for J.E. "did not develop a

suitable program calculated to confer a reasonable education

benefit . . . and thus failed to provide FAPE to the student"

and stated that "[t]he testimony and the evidence does not

support the District's conclusion that a 6:1:1 program would be

an educational setting that would be calculated to provide J.E.

with meaningful education progress."  Further, the IHO

determined that the FBA created in conjunction with the DOE's

---

[2]     The Supreme Court has established a three-part test, referred to as the
Burlington/Carter test to determine whether a special education student is
entitled to reimbursement for placement into a private school: (1) whether
the public school placement that had been provided or offered for the child
was an appropriate placement under the terms of the IDEIA ("Prong I"); (2)
whether the private school placement chosen by the parents was an appropriate
placement under the IDEIA ("Prong II"); and (3) whether a balancing of
equitable considerations favors reimbursement ("Prong III").  See Florence
County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Sch. Comm. of Town of
Burlington v. Dep't of Educ., 471 U.S. 359 (1985).

16

IEP "is not in compliance with state regulations. There is no specific data as to the frequency, duration, and intensity of the child's behavior. The document is useless as a basis for developing a BIP, which the regulations state the purpose of the FBA."

In 1988, in the Jose P. v. Ambach class action lawsuit, the DOE signed a "Consent Order" pursuant to which it assumed numerous affirmative obligations in the placement site selection process. The Consent Order has been in effect ever since. Nonetheless, the Jose P. Consent Order was not referred to in the hearing before the IHO and consequently was not addressed in the "Findings of Fact and Decision." As such, there was no determination as to whether a violation of the Consent Order constituted a FAPE deprivation under Prong I. See Jose P. v. Ambach, 669 F.2d 865 (2d Cir. 1982).

As to Prong II, the IHO held that "the record provides a clear description of J.E.'s program and how it is adapted to his individual needs. . . . The record reflects that progress has been made in the past and everything has been put in place for him to continue to make academic progress at the McCarton

17

School.   Therefore, the parent has met its burden with respect
to Prong II of the Burlington/Carter requirements."

As to Prong III, the IHO held that "the parent
cooperated with the District.  The equities clearly favor the
parents.  I would note that there was not one single scintilla
of evidence of testimony that the parents failed in any way to
cooperate with the District throughout the entire process."

The IHO specifically recognized that "the Final Notice
of Recommendation was not mailed [to the parents] until June 9
at the earliest.  The parent did act in good faith by visiting
the recommended placement and therefore reject it by letter of
6/27/08. . . .  There is no reason to penalize the parents for a
late notice of their decision to remain at the McCarton School."

Further, the IHO held that "[J.E.] was not in public
school, but enrolled at the McCarton School. . . .  The
regulations [requiring ten-day notice to the district before a
student is removed from the public school system] speak to the
removal of the student.  In this case the student was removed
years before the May 21, 2008 [IEP] review meeting."

18

Based on the above findings, the IHO decided in favor
of Plaintiffs and awarded the following relief:  "The Department
is to reimburse the parents for the any tuition that they have
paid directly or indirectly to the McCarton School up to the
amount paid and provide prospective funding if there is any
balance due for the 2008/2009 school year."

On or about October 1, 2009, the DOE filed a Verified
Petition with New York's Office of State Review appealing the
IHO's August 28, 2009 decision.

On or about October 27, 2009 (as amended October 28,
2009), Plaintiffs filed a Verified Answer requesting that DOE's
appeal be dismissed in its entirety, and that the IHO's decision
be affirmed.

On or about December 14, 2009, the SRO sustained the
DOE's appeal and found that Defendant had offered J.E. a FAPE.
The SRO held that the FBA, BIP, IEP and testimony of DeNuovo
supported a finding that the DOE had appropriately addressed
J.E.'s behavioral problems, the recommended school would be able
to implement the IEP's behavioral intervention plans, the
recommended 6:1:1 classroom would have been able to implement

19

the IEP and to address J.E.'s education needs, the recommended
1:1 behavior management paraprofessional would have adequately
supported J.E., and nothing in the hearing record supported the
IHO's finding to the contrary ("there is no evidence in the
hearing record showing that the student . . . would not be
adequately supported with a 1:1 paraprofessional").

        The SRO found that the DOE offered J.E. a FAPE for the
2008-09 school year.  Accordingly, Plaintiffs were denied
reimbursement relief.

        As to the Prong II appropriateness of J.E.'s
unilateral program and placement at the McCarton School, the SRO
held that the DOE failed to appeal the findings of the IHO with
regard to the appropriateness of the McCarton School.

        The SRO made no findings as to Prong III.


**The Standard of Review**

        Federal courts reviewing administrative determinations
under the IDEIA "must base their decisions on 'the preponderance
of the evidence,' taking into account not only the record from

20

the administrative proceedings, but also any further evidence presented before the District Court by the parties." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003); see 20 U.S.C. § 1415(i)(2)(c); Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). As the Supreme Court has concluded, this review of the record is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

Because "the role of the federal courts in reviewing state educational decisions under the [IDEIA] is circumscribed," the district court should not disturb the SRO's decision if it "is reasoned and supported by the record." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112-14 (2d Cir. 2007); see also A.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009); Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 547 (S.D.N.Y. 2010) (holding that the IDEIA demands "substantial deference to state administrative bodies on matters of

21

educational policy") (quoting <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 191 (2d Cir. 2005)).[3]


        Plaintiffs have contended that a different standard should apply and the SRO's decision should not be entitled to deference where, as here, the SRO is "demonstrably biased in favor of school districts." (Pl. Memo 5.)  In support of this contention, Plaintiffs have cited a spreadsheet purporting to demonstrate that the SRO in this case rules in favor of school districts a majority of the time, and a 2007 article from the <u>Wall Street Journal</u> entitled "Schools Beat Back Demands for Special-Ed Services."


        Based on their spreadsheet "analysis" of 187 SRO decisions, Plaintiffs assert that the SRO finds in favor of the school district more than three out of every four appeals. (<u>See</u> Pl. Memo 5.)  Even if Plaintiffs' characterization of these 187 cases is correct, this statistical "analysis" does not support a

---

[3]    Plaintiffs cite two cases for the proposition that the amount of weight to be given to state administrative proceedings is discretionary. <u>See</u> <u>Wolfe v. Taconic-Hills Cent. Sch. Dist.</u>, 167 F. Supp. 2d 530 (N.D.N.Y. 2001); <u>Wall v. Mattituck-Cutchoque Sch. Dist.</u>, 945 F. Supp. 501 (E.D.N.Y. 1996).  These cases rely on precedents from the First and Ninth Circuits, but more recent precedents in the Second Circuit direct district courts to be highly deferential to state administrative proceedings. <u>See, e.g.</u>, <u>Gagliardo</u>, 489 F.3d at 112-14; <u>Cerra</u>, 427 F.3d at 191.

finding of judicial bias that would compel the Court to review

the SRO's decision with anything other than its usual deference:

> It seems evident that statistics alone, no matter how
> computed, cannot establish extrajudicial bias.   There
> is no authority for, and no logic in, assuming that
> either party to a litigation is entitled to a certain
> percentage of favorable decisions.  The inquiry to be
> at all meaningful would necessarily require this court
> to examine each and every ruling to determine whether
> it was, initially, legally valid.  If we determined
> that some adverse rulings were correctly made,
> obviously they could not be tainted by bias.  Even if
> they were deemed to be incorrect, it of course does
> not follow that they were motivated by personal bias.

W.T. v. Bd. of Educ., 716 F. Supp. 2d 270, 286 (S.D.N.Y. 2010)

(quoting In re IBM Corp., 618 F.2d 923, 930 (2d Cir. 1980))

(rejecting a virtually identical spreadsheet "analysis"

regarding the same SRO).


     Plaintiffs have also cited a 2007 Wall Street Journal

article entitled "Schools Beat Back Demands for Special-Ed

Services," which disparages the SRO and implies that he is

biased against parents because he lives with someone who used to

work for the State Education Department.  (See Pl. Memo 5.)

This article has been deemed inadmissible hearsay every time

Plaintiffs' counsel has attempted to introduce it.  See, e.g.,

A.D. v. Bd. of Educ., 690 F. Supp. 2d 193, 217 (S.D.N.Y. 2010)

(holding that the article constitutes inadmissible hearsay and

is stricken from the record); Student X v. N.Y. City Dep't of

Educ., No. 07 Civ. 2316, 2008 WL 4890440, at *4 n.3 (E.D.N.Y.
Oct. 30, 2008) (same); M.M. v. N.Y. City Dep't of Educ., 583 F.
Supp. 2d 498, 503 (S.D.N.Y. 2008) (same).  Those rulings will be
followed here.

        Plaintiffs also contend that their evidence supports a
finding of probable or actual bias, requiring recusal under the
standard set forth in Caperton v. A.T. Massey Coal Co., --- U.S.
----, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009).  (See Pl. Memo
6.)  This argument was recently considered and rejected by the
court in W.T., which held that the Caperton standard does not
apply because a New York State regulation directly addresses the
issue of SRO conflicts of interest.  716 F. Supp. 2d at 285
(citing 8 NYCRR § 279.1(c)(4)).  Caperton concerned the standard
for recusal under the Due Process Clause of the Fourteenth
Amendment, a constitutional standard that "will . . . be
confined to rare instances."  Id. (quoting Caperton, 129 S. Ct.
at 2267) (cautioning that recusal issues are generally based on
codes of judicial conduct).

        Plaintiffs have also contended that the SRO meets the
standard for recusal set forth in the governing regulations.
These regulations provide that an SRO must have "no personal,

24

economic, or professional interest in the hearing" the SRO is assigned to review.  8 NYCRR § 279.1(c)(4).  Plaintiffs' suggestion that the SRO's living situation poses a generic conflict of interest does not constitute impermissible bias under the relevant regulations.  There is no evidence in the record that suggest that the SRO had any interest in the matter of J.E., or that the SRO's alleged living situation had any bearing on this particular case.  This same argument before another court has been rejected.  See M.S. v. New York City Dep't of Educ., 734 F. Supp. 2d 271, 279 (E.D.N.Y. 2010) (holding that plaintiffs' allegation of SRO bias have "no basis in any relevant evidence before the court").

Accordingly, the bias contention advanced by Plaintiffs has not been established, and the standard set forth above will be applied.

**The SRO Erred in Reversing the IHO Finding with Respect to Prong I**

The Supreme Court has interpreted the FAPE required by the IDEIA to mean an education "tailored to the unique needs of the handicapped child by means of an 'individualized education program.'" Rowley, 458 U.S. at 181-82.  To provide a FAPE, a

25

school district must comply with the procedural requirements set forth in the IDEIA, and the IEP that is developed must be "reasonably calculated" to enable the child to receive meaningful educational benefits. Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997).

While not every procedural violation is considered "material," the Supreme Court and Congress have emphasized the importance of the procedural provisions found in the IDEIA. Rowley, 458 U.S. at 205 ("the importance Congress attached to these procedural safeguards cannot be gainsaid").

The IHO's findings as to the appropriateness of the DOE's IEP were based upon the evidence presented with respect to the IEP. The IHO specifically stated:

> The [IEP] review team was comprised of the necessary personnel. However, the record reflects that only two of the attendees were Department of Education employees. The School Psychologist [Ms. Guan] did not know the student personally nor did she know if the other Department employee [Ms. O'Connor] knew the student personally. There was no testimony or evidence that indicated the Special Education Teacher had personal knowledge of the student. While the law and regulations do not require everyone on the [IEP] Review team to have personal knowledge, in this case the members of the team with such knowledge were the representatives of the McCarton [School].

26

The IHO noted that nearly all of the reports "relied upon" by the IEP team were developed by the McCarton School personnel, and all of these reports indicated that J.E. required 1:1 teaching support to make meaningful progress. "There is nothing in the report that states the student would benefit from a 6:1:1 program without intensive teacher support on a 1:1 basis."

The IHO held that the DOE's failure to conduct a proper FBA rendered the BIP inappropriate and constituted a FAPE deprivation. Citing 8 NYCRR §§ 200.1(r) and 200.22(a)(2) & (3), the IHO held that "the FBA as developed for the IEP is not in compliance with the state regulations. There is no specific data as to the frequency, duration and intensity of the child's behavior. The document is useless as a basis for developing a Behavior Intervention Plan, which the regulations state is the purpose of the FBA."

The Commissioner's Regulations require that a proper FBA include:

> the identification of the problem behavior, the
> definition of the behavior in concrete terms, the
> identification of the contextual factors that
> contribute to the behavior (including cognitive and
> affective factors) and the formulation of a hypothesis
> regarding the general conditions under which a

27

behavior usually occurs and probable consequences that
serve to maintain it.

8 NYCRR § 200.1(r).  The Commissioner's Regulations describe the
required sources and content of the FBA as follows:

> The FBA shall, as appropriate, be based on multiple
> sources of data. . . .  The FBA shall not be based
> solely on the student's history of presenting problem
> behaviors.
>
> The FBA shall provide a baseline of the student's
> problem behaviors with regard to frequency, duration,
> intensity and/or latency across activities, settings,
> people and times of the day, and include the
> information required in section 200.1(r) of this part
> in sufficient detail to form the basis for a
> behavioral intervention plan for the student that
> addresses antecedent behaviors, reinforcing
> consequences of the behavior, recommendations for
> teaching alternative skills or behaviors, and an
> assessment of student preferences for reinforcement.

8 NYCRR § 200.22(a)(2) & (a)(3).


        The SRO determined that the proposed IEP properly
addressed J.E.'s behavioral needs based upon the after-the-fact
testimony of Defendant's witnesses as to what the teacher,
DeNuovo, would have done if J.E. had attended his class.


        However, the Supreme Court has held that parents are
not required to try out the school district's proposed program.
See Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484 (2009)
(holding that private services merited reimbursement if the

public institution did not provide a FAPE, even if the student had never received special education services at the public institution).  The only information the parents can rely upon as to determining whether the proposed program is appropriate for their child is the IEP document itself.

The Third Circuit has noted that "[t]he IEP is so significant that the courts have characterized it as the 'centerpiece' of the IDEA's system for delivering education to disabled children." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (citing Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988))).  At a minimum, "the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Chambers v. Philadelphia Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009) (citation and quotations omitted).  The sufficiency of the IEP is determined from the content within the four corners of the IEP itself. See D.S., 602 F.3d at 565; Christen G. v. Lower Marion Sch. Dist., 919 F. Supp. 793, 815 (E.D. Pa. 1996) (the requirement of a formal written offer should be "enforced rigorously").

29

This rule enables parents to formulate any claims they might have based on the IEP and prevents the school district from relying on arguments about the services it "could have provided if it had been so inclined." Dumont Bd. of Educ. v. J.T., No. 09 Civ. 5048, 2010 WL 1875584, at *7 (D.N.J. May 10, 2010) ("Under the IDEA, however, 'in determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined.'") (quoting Lascari v. Bd. of Educ., 560 A.2d 1180, 1189 (N.J. 1989)).  The District of Columbia has held similarly.  See N.S. v. Dist. of Columbia, 709 F. Supp. 2d 57, 70-71 (D.D.C. 2010).

The SRO's reliance upon the teacher's testimony to remedy the deficits found by the IHO in the IEP was unwarranted. The SRO reversed the IHO's determination on this issue based on a decision give greater weight to the testimony of DeNuovo regarding hypothetical services at the proposed placement than to the evidence presented at the IEP hearing.  The SRO was not present at the hearing, and as such, should not have substituted his own credibility determinations for those of the IHO, who experienced the testimony of witnesses present at the hearing. See M.V. v. Shenendehowa Cent. Sch. Dist., No. 06 Civ. 0571,

30

2008 WL 53181, at *4-*5 (N.D.N.Y. Jan. 2, 2008) (finding the
credibility determinations and reasoning of the IHO more
reliable than those of the SRO).

The SRO, relying upon DeNuovo's testimony, concluded
that there was no evidence that 1:1 paraprofessional support
would be insufficient, as opposed to 1:1 teacher support. In so
doing, he ignored the statements of the McCarton School
Education Progress Report, cited above, and of its educational
director, that learning in a 6:1:1 setting would be impossible
for J.E. given his lack of attention and anxiety. These
statements, which the IHO cited at page 7 of his "Findings of
Fact and Decision," were not challenged directly as to
credibility or accuracy in the course of the IEP meeting or
subsequently. Indeed, the critical factual finding by the IHO
was that a 6:1:1 did not provide J.E. with an IEP that was
reasonably calculated to confer educational benefit. DeNuovo's
testimony regarding the hypothetical or projected conduct of his
class does not overcome these statements.

The IHO held that Ms. Guan "did not know the student
personally" and that there was "no testimony or evidence that
indicated that [DeNuovo] had personal knowledge of the student"

31

these being the only DOE witnesses at the hearing.  The IHO noted that the only members of the IEP team with personal knowledge of J.E. "were the representatives of the McCarton School."  Accordingly, nothing in the SRO's decision suggests that it is based on "educational policy," particularly given that it relies so heavily on the testimony individuals who lacked personal knowledge of J.E.

This Court has repeatedly, and recently, reversed the SRO where it has found that the SRO's decision was not "thorough and careful."  See, e.g., E.S. v. Katonah-Lewisboro Sch. Dist., No. 09 Civ. 4770, 2010 WL 3835008, at *21-*22 (S.D.N.Y. Sept. 30, 2010) (reversing SRO ruling for "fail[ing] to take into account important information"); M.H. v. N.Y. City Dep't of Educ., 712 F. Supp. 2d 125, 154-55 (S.D.N.Y. 2010) ("the SRO's determination cannot be considered 'thorough and careful' because the SRO considered only [the student's] annual academic goals, whereas the IHO based her decision on both the annual academic goals and the short-term objectives").  Although the SRO is entitled to substantial deference, the appeals process would be rendered superfluous and academic if the court were simply to "rubber stamp" administrative decisions.  Cf. Walczak, 142 F.3d at 129.

32

Plaintiffs have also contended that the DOE violated the Jose P. Consent Order by its proposed unilateral placement.

The Jose P. Consent Order describes procedural requirements for IEP meetings and sets out the categories information the placement officer is required to communicate to the parents, all of which would be material to any placement situs selection.  Specifically, Paragraphs 26 and 27 of the Consent Order provide:

> Effective September 1, 1989, at the conclusion of each CSE meeting which results in the drafting of a program recommendation the parent attending the meeting will be offered the opportunity to meet with the placement officer or assistant placement officer and at least one other CSE member to discuss specific placement sites.  At the meeting with the placement officer, the parent will be provided with:
>
> 1. Information concerning the classes in the neighborhood school or in nearby schools if there is no appropriate class in the neighborhood school or if the parent seeks information about additional classes. All such classes shall be appropriate to meet the student's needs and shall currently have vacancies or be projected to have vacancies within the applicable timeline for this student's placement.
>
> 2. Information concerning the age ranges and functional levels of students in each of the particular classes being considered. If at all possible, a site will be offered to the parent by the end of the meeting. . . .  If, in an exceptional individual circumstance, a placement officer is not available to meet with a parent at the conclusion of a CSE meeting, the parent will be given the option of

33

meeting with a placement officer and a CSE member at a
mutually agreeable future date or the option of
receiving . . . placement information in the mail.


At the May 21, 2008 IEP meeting, no specific placement
recommendation was made, no placement officer was present, and
Plaintiffs had no opportunity to meet with a placement officer
to get information regarding the ages and functioning levels of
the students with whom J.E. would be placed.  According to
Plaintiffs, the Jose P. Consent Order thus provides an
independent basis for a Prong I FAPE deprivation.


A similar contention was recently rejected in the
Eastern District of New York.  In M.S., the court deemed the
Jose P. Consent Order irrelevant, because it "was signed between
the Department and a class of plaintiffs who complained of the
Department's failure to timely evaluate and place children in
special education programs," and the student in that case had
been timely evaluated and placed.  734 F. Supp. 2d at 279.
Here, J.E.'s evaluation and placement were complete by June
2008, rendering them timely and removing J.E. from the scope of
the Jose P. class.

Even were J.E. a Jose P. class member, the DOE still
did not violate the Jose P. Consent Order because the parents of
J.E. were offered an opportunity to consult with a placement
officer.  The FNR provided the name, phone number and address of
a placement officer whom plaintiffs could have contacted to
discuss the recommended placement or to request another IEP
meeting.  Such an offer satisfies the Jose P. Consent Order's
requirement that parents be "offered the opportunity to meet
with the placement officer."  See M.S., 734 F. Supp. 2d at 279
(citing Jose P. Consent Order ¶ 27).  The fact that Plaintiffs
chose not to take the opportunity presented in the FNR does not
mean the DOE failed to provide one.  See id.

Nonetheless, though the DOE did not violate the Jose
P. Consent Order, the SRO erred in reversing the IHO's factual
finding with respect to the 1:1:1 ratio.

**J.E.'s Program Was "Reasonably Calculated" to
Provide J.E. with Meaningful Educational Benefits**

Under Prong II, parents seeking reimbursement for a
private placement bear the burden of demonstrating that the
private placement is appropriate.  However, the burden for
parents under Prong II is somewhat less stringent than the

35

burden for the school district under Prong I.  Accordingly,
"parents are not barred from reimbursement where a private
school they choose does not meet the [IDEIA] definition of a
free appropriate public education.  An appropriate private
placement need not meet state education standards or
requirements." Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d
356, 364 (2d Cir. 2006) (citing Carter, 510 U.S. at 14).

     Once a Prong I deprivation has been demonstrated, the
parents' unilateral placement need not be perfect, need not meet
all of the child's special education needs, and need not even
constitute the child's least restrictive environment to satisfy
the Prong II standard.  See id.  Furthermore, under Prong II,
the placement need not offer the child an IEP or employ
"certified" special education teachers.  See id.  In essence,
"the test for the parents' private placement is that it is
appropriate, and not that it is perfect." Id. (quoting Warren G.
v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir.
1999)).

     To qualify for reimbursement relief, the Prong II
program and services must simply represent "educational
instruction specially designed to meet the unique needs of a

36

handicapped child supported by such services as are necessary to permit the child to benefit from instruction." Id. at 365 (citing Rowley, 458 U.S. at 188-89). The test of appropriateness under Frank G. is simply that the placement and program be "reasonably calculated" to provide meaningful educational benefits to the child. See A.D. v. Bd. of Educ., 690 F. Supp. 2d 193, 214-15 (S.D.N.Y. 2010) (reversing the SRO for erring as a matter of law by "applying a heightened standard of proof to plaintiffs' burden on the second prong"). This is primarily a prospective test that does not require evidence of progress and achievement by the student in the parents' placement. See Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 115 (2d Cir. 2007); cf. D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir. 2005) ("[T]his court has not, as yet, decided if it is error to consider retrospective evidence in assessing the substantive validity of an IEP.").

In this case, the IHO concluded that Plaintiffs satisfied their Prong II burden and the DOE did not appeal that portion of the IHO decision when it filed its appeal with the Office of State Review. Accordingly, Prong II is not properly the subject of this appeal.

**The Equities Favor Plaintiffs Under Prong III and**
**Should not Preclude or Diminish Reimbursement Relief**


Once a determination in favor of the parents has been
made on the first two Prongs of the Burlington/Carter test, a
determination of "appropriate" relief, including reimbursement,
is made based upon various equitable considerations.  See Still
v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996); cf. M.C. v.
Voluntown Bd. of Educ., 226 F.3d 60, 68 (2d Cir. 2000) ("It is
well established that 'equitable considerations are relevant in
fashioning relief' under the [IDEIA].") (quoting Burlington, 471
U.S. at 374).  Courts must keep in mind that the goal of the
IDEIA is "to give handicapped children both an appropriate
education and a free one; it should not be interpreted to defeat
one or the other of those objectives."  Burlington, 471 U.S. at
372.


One important consideration in determining appropriate
relief is whether or not the parents notified the school board
of their dissatisfaction with the IEP.  See M.C., 226 F.3d at 68
("[R]eimbursement is barred where parents unilaterally arrange
for private educational services without ever notifying the
school board of their dissatisfaction with their child's IEP.").
In its "Findings of Fact and Decision," the IHO addressed the

38

notice issue: "[J.E.] was not in public school, but enrolled at the McCarton School. . . .  The regulations [requiring ten-day notice to the district before a student is removed from the public school system] speak to the removal of the student.  In this case the student was removed years before the May 21, 2008 [IEP] review meeting."  The IHO Decision notes that "[t]he Final Notice of Recommendation was not mailed [to the parents] until June 9 at the earliest.  The parent did act in good faith by visiting the recommended placement and therefore rejected it by letter of 6/27/08. . . .  There is no reason to penalize the parents for a late notice of their decision to remain at the McCarton School."

Plaintiffs therefore timely notified Defendant that they were rejecting Defendant's proposed placement and program as inappropriate and that they would continue to look to Defendant for reimbursement.

The IHO, who heard and assessed the credibility of the witnesses and evidence presented, made findings as to Prong III in Plaintiffs' favor.  Specifically, the IHO found that "the parent cooperated with the District.  The equities clearly favor the parents.  I would note that there was not one single

39

scintilla of evidence or testimony that the parents failed in any way to cooperate with the District throughout the entire process."  The SRO, because it found that Defendant offered J.E. a FAPE, failed to address Prong III of the Burlington/Carter test.

Accordingly, the finding of the IHO will be accorded due deference and is hereby adopted.


**Conclusion**

Upon the findings and conclusions set forth above, the SRO's Decision is reversed as clearly erroneous, the IHO's "Findings of Fact and Decision" are reinstated, and judgment is granted to Plaintiffs on their complaint.  Plaintiffs are granted leave to submit a fee application pursuant to the express fee-shifting provisions of the IDEIA.


It is so ordered.

**New York, NY**
**March // , 2011**

ROBERT W. SWEET
U.S.D.J.

40